'08 FEB 25 A9:34

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    Case No. 08-CR-

GIROSMEX SA de CV,                  **08 CR 62**

        Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Steven M. Biskupic, United States Attorney for the Eastern District of Wisconsin, and Daniel H. Sanders, Assistant United States Attorney for the Eastern District of Wisconsin, and the defendant, GirosMex SA de CV, which is a corporation organized under the laws of Mexico, by its duly authorized representative and by attorney Michael Fitzgerald, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in an a one-count information which alleges a violation of Title 18, United States Code, Sections 1960(a) and 1960 (b)(1)(B), as well as a forfeiture notice pursuant to Title 21, United States Code, Section 853.

3.      The defendant, by its duly authorized representative, has read and fully understands the charge contained in the information and fully understands the nature and elements of the crime with which the corporation has been charged. In addition, that charge and the terms and conditions of the plea agreement have been fully explained to the defendant's representative by its attorney.

4. The defendant, by its duly authorized representative, voluntarily agrees to plead guilty to the offense charged in the information, which is set forth in full below:

THE UNITED STATES ATTORNEY CHARGES:

## COUNT ONE

From on or about February 7, 2004, and continuing to on or about January 10, 2005, in the State and Eastern District of Wisconsin, and elsewhere,

### GIROSMEX SA de CV,

the defendant herein, did knowingly conduct a money transmitting business that affected interstate and foreign commerce, and failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330, and regulations prescribed under such section.

All in violation of Title 18, United States Code, Sections 1960(a) and 1960 (b)(1)(B).



5. The defendant, by its duly authorized representative, acknowledges, understands, and agrees that the defendant is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts outlined in Attachment A beyond a reasonable doubt. The defendant admits to these facts and that these facts establish its guilt beyond a reasonable doubt. This information is provided for the limited purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in this offense.

## PENALTIES

6. The parties understand and agree that under Title 18, United States Code, Sections 1960(a) and 1960(b)(1)(B), the offense to which the defendant will enter a guilty plea carries a

2

maximum fine of $250,000. The offense also carries a mandatory special assessment of $400 and a term of probation of up to five (5) years.

## ELEMENTS

7. The parties understand and agree that to sustain the charge of operating an unlicensed money transmitting business, as alleged in the indictment, the United States must prove each of the following propositions beyond a reasonable doubt:

First    the defendant knowingly operated a money transmitting business;

Second    the money transmitting business affect interstate and foreign commerce; and

Third    the money transmitting business failed to comply with the money transmitting business registration requirements specified by T. 31 U.S.C, § 5330 or regulations proscribed under that section

## SENTENCING PROVISIONS



8. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

9. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

10. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense to which the defendant is pleading guilty. The defendant, by its duly authorized representative, acknowledges and agrees that its attorney in turn has discussed the applicable sentencing guidelines provisions with the corporate representative to the defendant's satisfaction.

3

11. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's culpability score. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's culpability score.

## Sentencing Guidelines Calculations

12. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.



## Offense Level

13. The parties agree to recommend to the sentencing court that the applicable offense level for the offense charged in the information is six (6) under Sentencing Guidelines Manual §§ 2S1.3(a)(2), 2B1.1(b)(1)(J), and 2S1.3(b)(3).

## Culpability Score

14. The parties agree to recommend to the sentencing court that the applicable base culpability score for the offense charged in the information is five (5) under Sentencing Guidelines Manual §8C2.5(a).

4

15. The parties acknowledge and understand that the government will recommend to the sentencing court that for purposes of determining the defendant's culpability score under Sentencing Guidelines Manual § 8C2.5, one (1) point should be added to the defendant's culpability score pursuant to § 8C2.5(b)(5) because the defendant had 10 or more employees and individuals within substantial authority personnel participated in, condoned or were wilfully ignorant of the offense.

16. The government agrees to recommend to the sentencing court that for purposes of determining the defendant's culpability score under Sentencing Guidelines Manual § 8C2.5, one (1) point should be subtracted from the defendant's culpability score pursuant to § 8C2.5(g)(3) because the defendant clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct.

## Sentencing Recommendations



17. Both parties reserve the right to advise the district court and the probation office of any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

18. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

19. The government and the defendant agree to recommend that a sentence be imposed within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

20. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The parties further understand that the United States Probation Office will make its own recommendations to the

sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the application of the sentencing guidelines and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court may, in certain circumstances, depart either upward or downward from the otherwise applicable guideline range.

21. The parties acknowledge, understand, and agree that the defendant may not move to withdraw its guilty plea solely as a result of the sentence imposed by the court.

### FINANCIAL MATTERS

22. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

### Fine



23. The government and the defendant both agree to recommend to the United States Probation Office and the sentencing court that, pursuant to Sentencing Guidelines Manual §§ 8C2.7, the defendant be sentenced to pay a total of $10,000.

### Special Assessment

24. The defendant agrees to pay the special assessment in the amount of $400 prior to or at the time of sentencing.

### Forfeiture

25. The defendant agrees to pay a money judgment in the amount of $30,000, an amount representing the unseized proceeds of the violation charged in the information. The defendant agrees that the above-listed items were obtained by it in connection with it's illegal activity as alleged in the information. The defendant further agrees to pay the money judgment in the amount of $30,000 to

6

be paid by Electronic Funds Transfer within ten (10) days of entry of the Judgment and Conviction.

## **DEFENDANT'S WAIVER OF RIGHTS**

26. In entering this agreement, the defendant acknowledges and understands that in so doing it surrenders any claims it may have raised in any pretrial motion, as well as certain rights which include the following:



    a. If the defendant persisted in a plea of not guilty to the charge against it, the defendant would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and its attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and the defendant's counsel would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on its own behalf. The defendant would be entitled to compulsory process to call witnesses.

27. The defendant, by its duly authorized representative, acknowledges and understands that by pleading guilty the defendant is waiving all the rights set forth above. The defendant further

7

acknowledges the fact that its attorney has explained these rights to the representative of the defendant and the consequences of its waiver of these rights.

28. The defendant, by its duly authorized representative, acknowledges and understands that it will be adjudicated guilty of the offense to which it will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to submit bids for federally funded construction projects.

29. The defendant, by its duly authorized representative, knowingly and voluntarily waives all claims it may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant, by its duly authorized representative, agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action



30. The defendant, by its duly authorized representative, acknowledges, understands, and agrees that the defendant's duly authorized representative has discussed with the corporation's attorney and understands that nothing contained in this agreement, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

31. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

8

32. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

33. The parties acknowledge and agree that the United States Attorney's Office and Antitrust Division are free to notify any local, state, or federal agency of the defendant's conviction.

34. The defendant understands that pursuant to the Victim and Witness Protection Act and the regulations promulgated under the Act by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Further Action by Internal Revenue Service



35. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charge alleged in the ininformation.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

36. The defendant, by its duly authorized representative, acknowledges and understands if the defendant violates any term of this agreement at any time or engages in any further criminal activity prior to sentencing, this agreement shall become null and void at the discretion of the government. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant, by its duly authorized representative, hereby knowingly and voluntarily waives any defense based on the

9

applicable statute of limitations for any charges filed against the defendant as a result of its breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

37. The defendant, by its duly authorized representative, acknowledges, understands, and agrees that the defendant will plead guilty freely and voluntarily because it is in fact guilty. The defendant, by its duly authorized representative, further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.



10

Case 2:08-cr-00062-RTR   Filed 02/25/08   Page 10 of 17   Document 2

## ACKNOWLEDGMENTS

I am a duly authorized representative of the defendant. I am entering into this plea agreement on behalf of the defendant freely and voluntarily and with full knowledge and the express authorization of the Board of Directors of the defendant. The attorney for the defendant has reviewed every part of this agreement with me and has advised me, on behalf of the defendant, of the implications of the sentencing guidelines. I have discussed all aspects of this case with the corporation's attorney and I am satisfied that the attorney for the corporation has provided effective assistance of counsel.

GIROSMEX SA de CV

Date: 25-11-07    By: _____

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 11/29/07    _____
MICHAEL FITZGERALD
Attorney for Defendant

For the United States of America:

Date: 1/29/08    _____
STEVEN M. BISKUPIC
United States Attorney

Date: 1/29/08    _____
DANIEL H. SANDERS
Assistant United States Attorney

11

# Attachment A

## I. Eladio Sanchez-Lozano, President, GirosMex SA de CV

Eladio Sanchez-Lozano (Sanchez) is a citizen of Mexico and is the owner/president of GirosMex SA de SV (GirosMex), a Mexican corporation in the business of operating money transmitting businesses in Jalisco, Mexico. Based on interviews conducted by various DHS officials and financial reports, Sanchez and his associates are knowledgeable of currency reporting requirements and laws relating to the operation of a money transmitting business in the U.S.

## II. GirosMex Acconnt Information

JP Morgan Chase Bank (formerly Bank One) records indicate the following account holder data relating to the accounts receiving the above deposits on behalf of GirosMex.

(a) Account Number: 639085745 (the Milwaukee account)
    Account Type: Commercial Checking
    Location: JP Morgan Chase Bank
    1337 South Cesar Chavez Drive, Milwaukee, WI
    Account Name: GirosMex SA de CV, Mexican Corp., c/o Eladio Sanchez
    Carr Encarnacion San Juan KM 1
    Encarnacion de Diaz, Jalisco 47270
    Authorized Parties: Eladio Sanchez
    Date Opened: January 31, 2003

(b) Account Number: 1596624401 (the Houston account)
    Account Type: Commercial Checking
    Location: JP Morgan Chase Bank
    1337 Gessner, Houston, Texas
    Account Name: GirosMex SA de CV, c/o Eladio Sanchez
    Carr Encarnacion San Juan KM 1
    Encarnacion de Diaz, Jalisco 47270
    Authorized Parties: Eladio Sanchez & Juan M. Sanchez
    Date Opened: September 27, 2004

## III. Chronological Summary of Importations/Deposits by City

A review of ICE records, Currency or Monetary Instrument Reports (CMIRs) and Currency Transaction Reports (CTRs) have identified the following international arrivals and importations of bulk currency and/or financial instruments of interest to this investigation. Unless otherwise noted below, most of the arrivals were into Houston, TX, all arrivals originated in Mexico, all importations were in U.S. Currency, and all persons importing and depositing bulk currency indicated via CMIR or CTR, and/or during interviews, that they were acting on behalf of GirosMex, a Mexican bank.

## The Milwaukee Account

| Date | Participant | Importation $ | Deposit $ |
|---|---|---|---|
| 02/07/04 | Sanchez | 171,600 | |
| 02/09/04 | Juan Manual Sanchez-Lozano | | 131,600 |
| 02/21/04 | Sanchez | 244,550 | |
| 01/23/04 | unknown | | 244,550 |
| 03/05/04 | Sanchez | 214,000 | |
| 03/18/04 | Jose Luis Sanchez-Verdin | | 214,000 |
| 03/18/04 | Jose Luis Sanchez-Verdin | 260,000 | |
| 03/19/04 | Juan Manual Sanchez-Lozano | | 260,000 |
| 03/29/04 | Jose Luis Sanchez-Lozano | 259,200 | |
| 03/30/04 | Gerardo Mora-Ramirez | | 259,200 |
| 04/03/04 | Sanchez | 249,200 | |
| 04/05/04 | Juan Manual Sanchez-Lozano | | 218,200 |
| 04/14/04 | Jose Luis Sanchez-Verdin | 254,793 | |
| 04/15/04 | Gerardo Mora-Ramirez | | 186,600 |
| 04/24/04 | Sanchez | 288,600 | |
| 04/26/04 | Gerardo Mora-Ramirez | | 178,050 |
| 05/12/04 | Juan Manual Sanchez-Lozano | 100,000 | |
| 05/02/04 | Jorge Colunga-Castaneda | 219,046 | |
| 05/03/04 | Gerardo Mora-Ramirez | | 178,050 |
| 05/12/04 | Juan Manual Sanchez-Lozano | 100,000 | |
| 05/13/04 | Juan Manual Sanchez-Lozano | | 163,958 (2 Accounts) |
| 05/23/04 | Jorge Colunga-Castaneda | 242,027 | |
| 05/24/04 | Gerardo Mora-Ramirez | | 132,900 |
| 07/01/04 | Sanchez | 188,600 | |
| 07/02/04 | Night Deposit - unknown | | 188,600 |
| 07/26/04 | Jose Luis Sanchez-Verdin | 330,000 | |
| 07/27/04 | Gerardo Mora-Ramirez | | 310,000 |
| 08/13/04 | Jorge Colunga-Castaneda | 204,000 | |
| 08/16/04 | Gerardo Mora-Ramirez | | 390,000 |
| 09/24/04 | Sanchez | 200,000 | |
| 09/24/04 | Sanchez | | 200,000 |
| 10/12/04 | Juan Manual Sanchez-Lozano | | 210,000 |
| 10/28/04 | Sanchez | 313,217 | |
| 10/29/04 | Juan Manual Sanchez-Lozano | | 191,200 |
| 12/15/04 | Jorge Colunga-Castaneda | 253,000 | |
| 12/16/04 | Juan Manual Sanchez-Lozano | | 253,000 |
| 01/05/05 | Jose Luis Sanchez-Lozano | 392,100 | |
| 01/06/05 | Juan Manual Sanchez-Lozano | | 390,000 |
| 01/10/05 | Juan Manual Sanchez-Lozano | 220,000 | |
| 01/10/05 | Juan Manual Sanchez-Lozano | | 198,020 |
| **Totals** | | **$4,703,933** | **$4,497,928** |

Banking records prepared by JP Morgan Bank pertaining to the activities relating to the Milwaukee account associated with Sanchez and GirosMex indicate the bank closed the account, with 30 days notice to the account holder, because banking officials suspected that the accounts were being utilized to facilitate the operation of an unlicensed money service business. As described below, a final deposit into the Milwaukee account was made on January 10, 2005. On February 11, 2005, systematic deposits into the Houston account commenced.

13

## The Houston Account

| Date | Participant | Importation $ | Deposit $ |
|---|---|---|---|
| 11/18/04 | Eladio Sanchez-Lozano | 330,000 | |
| 11/18/04 | Sanchez | | 330,000 |
| 01/18/05 | Sanchez | 435,685 | |
| 02/11/05 | Sanchez | 334,000 | |
| 02/11/05 | Sanchez | | 334,000 |
| 03/03/05 | Sanchez | 58,989 | |
| 03/04/05 | Sanchez | | 58,990 |
| 04/07/05 | Sanchez | 249,819 | |
| 04/07/05 | Sanchez | | 185,200 |
| 04/27/05 | Sanchez | 278,518 | |
| 04/27/05 | Sanchez | | 223,300 |
| 05/13/05 | Sanchez | 287,316 | |
| 05/13/05 | Sanchez | | 210,000 |
| 06/01/05 | Sanchez | 237,000 | |
| 06/02/05 | Sanchez | | 237,000 |
| 06/14/05 | Sanchez | 110,800 | |
| 06/14/05 | Sanchez | | 110,800 |
| 07/13/05 | Sanchez | 140,500 | |
| 07/13/05 | Sanchez | | 141,276 |
| 01/14/06 | Sanchez | 85,163 | |
| 02/24/06 | Sanchez | 225,200 | |
| Totals | | $2,772,990 | $1,830,566 |
| | | | |
| Addition of Milwaukee Numbers | | $4,703,933 | $4,497,928 |
| | | | |
| Totals from 2/7/04 - 2/24/6 | | $7,476,923 | $6,328,494 |

## IV. Significant Statements made by Sanchez and his Associates

On January 18, 2005, Sanchez declared $435,685 upon his arrival in Houston. Sanchez declared via CMIR he was acting on behalf of GirosMex, a Mexican bank. Sanchez declared his address in the U.S. as 8534 Hammerly Boulevard, Suite C, Houston (InstaPay/UniPago). Sanchez stated he is the owner of GirosMex and had owned the business for approximately five years. Sanchez also declared the purpose of his importations of bulk U.S. currency and financial instruments was to convert the dollars to Mexican currency. Following the currency conversion, the funds were to be returned to Mexico. Sanchez characterized this shipment of currency as being proceeds from GirosMex during the Christmas holidays. Sanchez possessed a business card which identified himself as the Director General of Giros RealMex (GirosMex) in Jalisco, Mexico.

On March 3, 2005, Sanchez declared $58,989 upon his arrival via the McAllen, TX U.S. POE. Sanchez entered the U.S. by driving a vehicle bearing Mexican registration # JCK2247. Sanchez declared via CMIR he was acting on behalf of GirosMex, but in the CMIR, Sanchez declared that GirosMex is not a bank.

14

On April 5, 2005, Jorge Colunga-Castaneda arrived in Dallas-Fort Worth. Colunga-Castaneda said GirosMex physically imports bulk currency into the U.S. because it's Mexican bank charges five percent of the gross amount to wire transfer the funds. Colunga-Castaneda explained it was therefore more cost effective to physically transport the currency into the U.S.

On April 7, 2005, Sanchez declared $249,819 upon his arrival in Houston. Sanchez again declared his address in the U.S. as 8534 Hammerly Boulevard, Suite C, Houston (InstaPay/UniPago). Sanchez said he owns GirosMex, is in the wire transfer business and makes monthly deposits on behalf of his bank. Sanchez confirmed that Jose Luis Sanchez-Verdin, Jorge Colunga-Casteneda and Saul Davalos-Lozano had imported bulk currency into the U.S. at the direction of Sanchez and on behalf of GirosMex.

On May 13, 2005, Sanchez declared $287,316 upon his arrival in Houston. He declared via CMIR he was acting on behalf of GirosMex, but did not declare if this was or was not a bank. Sanchez again declared his address in the U.S. as 8534 Hammerly Blvd, Suite C, Houston (InstaPay/UniPago). Among the financial instruments that Sanchez was importing was a broad variety of money orders, checks and other instruments predominantly drawn against financial institutions or endorsed by parties in California. Sanchez said he planned to acquire a commercial building at 226 E. Little York Rd, Houston, for $270,000 and then return to Mexico. Sanchez possessed a real estate contract relating to the sale which identified the buyers as himself, Eladio Sanchez, and Juan M. Sanchez. The selling price was $270,000, which was to be paid in cash at closing. Sanchez also possessed the following documents, which describe how GirosMex SA de CV maintains two peso accounts and one dollar account in Mexican banks and two accounts in the U.S.:

On June 1, 2005, Sanchez declared $237,000 upon his arrival in Houston. Sanchez again declared his address in the U.S. as 8534 Hammerly Boulevard, Suite C, Houston (InstaPay/UniPago). Sanchez also possessed copies of currency transmitter licenses issued by the Texas Department of Banking to InstaPay/UniPago at locations in Austin and San Marcos, TX. Sanchez also possessed a UniPago organizational chart which described administrative positions commonly associated with compliance with the Bank Secrecy Act.

On January 14, 2006, Sanchez declared $85,163 after he entered the U.S. via the Laredo POE while driving a vehicle bearing Mexican registration # JEE6247. Sanchez declared via CMIR he was acting on behalf of GirosMex, a bank in Mexico. Sanchez said he was physically transporting bulk currency instead of wire transferring it to avoid a five percent fee imposed by a Mexican bank. Sanchez added he subsequently wire transferred the money back to Mexico when the exchange rate became favorable. Sanchez explained he was importing the currency because he did not want his money remitting business in Houston to run short of cash when the banks in the United States closed on Monday, January 16, 2006, in observance of a federal holiday. $60,000 of the amount being imported were in one-hundred dollar denominations. Sanchez asserted the currency was derived as a result of his money remitting business in Mexico, which he identified as GirosMex. Sanchez indicated he and his brother jointly owned the money remitting business located at 226 East Little York Road, Houston. Sanchez said he was the owner of GirosMex and said Jorge Colunga-Castaneda

15

and an unidentified attorney also import bulk currency into the U.S. on his behalf.

On February 24, 2006, Sanchez declared $225,200 upon his arrival in Houston. Sanchez declared via CMIR that he was acting on behalf of GirosMex. Sanchez declared the money was being imported for use by his money remitting businesses. He added that he had acquired another money remitting business in Pasadena, TX, and displayed a business card which identified the address of the Pasadena location as 816 South Richey. The card also included 226 Little York Road as a branch office location. Sanchez also remarked either he or his business were leasing two other locations in the Houston area for use as money remitting businesses. Sanchez offered only a generalized street location of one of the new business offices and was unable to provide any information as to the location of the fourth office.

On April 13, 2006, under the pretext of a Cornerstone presentation (DHS outreach program for the financial community), case agents interviewed Juan Sanchez-Lozano at RealMex, 1636 W. Forest Home, Milwaukee. Juan identified himself as the sole owner and president of RealMex, a currency exchange based in Milwaukee. Juan said that RealMex had authorized agents throughout Wisconsin, Georgia, Nebraska, Missouri, and Texas. The national headquarters for RealMex is in Milwaukee at 1636 W. Forest Home Avenue.

Juan stated that RealMex and GirosMex have an arms length relationship pursuant to a written contract. Juan also said that Eladio Sanchez-Lozano was not authorized to conduct business in the U.S. under RealMex's license. At no time during the interview did Juan state that he and other employees of RealMex imported and deposited money on behalf of GirosMex as detailed above.

On January 24, 2007, Sanchez attempted to gain entry into the U.S. from Mexico at the Laredo, TX crossing. Sanchez was arrested on an outstanding warrant from the EASTERN District of Wisconsin. Sanchez was advised of his right, indicated he undersdtood his rights, and agreed to be interviewed by Customs and Border Protection Officers.

Sanchez stated that he is the director/owner of GirosMex, a Mexican company that disburses money coming from the U.S. to individuals in Mexico. Sanchez stated that GirosMex is not a money transmitting business and is not registered with the U.S. Department of Treasury. Sanchez stated that GirosMex disbutes money to individuals that is sent to GirosMex in Mexico by RealMex in the U.S. GirosMex obtains a $4.00 fee for each disbursement. GirosMex also sends money from Mexico to customers in the U.S. through RealMex. GirosMex charges a fee of $10.00 for the Mexico-U.S. transactions, a portion of which is paid to RealMex.

Sanchez stated that the U.S. currency that he and his associates imported from Mexico to the U.S. is GirosMex money. Sanchez stated that approximately 60% of the imported U.S. currency is from GirosMex's Mexican customers. Sanchez stated that GirosMex saves money by importing the money to the U.S. rather than depositing the U.S. currency in Mexican banks because Mexican banks charge a fee of 10-15% of the money being deposited.

## V. Conclusion

Combining the deposits, withdrawals and balances for all five accounts attributed to Sanchez and GirosMex SA de CV (converting the peso amounts to dollars based upon the mid-market exchange rate on July 21, 2005 of $1.00=10.6194 pesos) yielded the following summary of known total bank activity during the month of March 2005.

| | |
|---|---|
| Deposits | $8,056,069 U.S. |
| Withdrawals | $7,761,608 U.S. |

Also noteworthy of the activity associated with each of the accounts was the systematic turnover of funds through each account in a short period of time, as illustrated by the below totals of monthly deposits versus withdrawals during March 2005.

| Deposits | Withdrawals | Account |
|---|---|---|
| 39,285,686.25 | 39,040,059.62 | Banorte Bank (Peso) |
| 29,925,854.48 | 28,228.645.08 | Banamex Bank (Peso) |
| $101,000.00 | $90,436.53 | Banamex Bank (U.S.) |
| $58,989.10 | $50,000.00 | Houston account |
| $1,377,720.88 | $1,285,917.45 | Milwaukee account |

The investigation indicates the systematic, high-turnover of short-duration deposits and withdrawal activity is consistent with the operation of a money service business.

GirosMex maintains peso and/or dollar accounts at Banorte Bank and Banamex Bank, which are both substantial financial institutions in Mexico offering a broad range of personal, business and corporate international banking services. Dollars can be converted into pesos at Mexican financial institutions.

On March 17, 2006, a review of the list of USDT records indicated no record that Sanchez or GirosMex were registered as money service businesses.